**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 96-30299

(Summary Calendar)
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TROY THOMAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
(95-CR-286-K)

_____

February 17, 1997

Before DAVIS, EMILIO M. GARZA, and STEWART, Circuit Judges.

PER CURIAM:[*]

Undercover officers working at the New Orleans International Airport searched a bag belonging to defendant Troy Thomas and discovered counterfeit credit cards and identification as well as a computer printout containing fraudulently obtained names, account numbers, and expiration dates for credit cards belonging to forty-

_____

[*] Pursuant to Local Rule 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

four different individuals. Thomas moved to suppress. After the court denied the motion, Thomas pled guilty to possession of counterfeit access devices with intent to defraud in violation of 18 U.S.C. §§ 1029(a)(3), 1029(b)(1), and 2, but reserved the right to appeal the denial of his motion to suppress. Thomas now appeals. We affirm.

I

Dressed in plain clothes, Jefferson Parish Sheriff's Lieutenant Glenn Davis and Drug Enforcement Agency ("DEA") Special Agent Don Penny were conducting routine surveillance of passengers arriving on a 10:00 p.m. flight from Houston. They followed one passenger out of the gate area and down the concourse. Glancing back, Davis noticed that another passenger, Thomas, was walking behind the officers and staring at them intently.[2] Thomas was carrying a small bag and appeared very nervous.

The first suspect, the officers, and Thomas proceeded to the baggage claim area. Thomas immediately exited the terminal and approached the taxi line. Davis followed Thomas, leaving Penny to watch the first suspect. Flashing cash, Thomas approached the fourth cab in line and said that he "needed to leave the airport." The driver told Thomas to go to the first cab in line. Thomas then importuned the driver of the third cab, and received the same

---

[2] Although Davis did not realize it at the time, he had previously questioned Thomas and seized a false driver's license. Thomas was also the subject of fugitive warrants in both New Orleans and Las Vegas.

-2-

answer. Davis flagged Penny and the officers accosted Thomas as he neared the first cab. Penny showed his credentials, told Thomas that he was a DEA agent, and asked to speak to him for a minute. Davis also identified himself as a law enforcement officer. Thomas responded with a curse, but said "okay."

The trio was standing on a median between the cab lane and the general traffic lanes, a congested and noisy area. Davis asked Thomas if they could "step inside the building" to talk. Thomas said "no problem," and accompanied the officers through a nearby door into the airport baggage area. The baggage area is twenty-five to fifty feet from the cab stand, and open to the public.

Thomas told the officers that he had just flown in from Texas but had lost his plane ticket and had no identification with him. Thomas gave the officers what turned out to be a false name, but said that he had not flown under that name; he claimed that his ticket was listed in his girlfriend's name because she had made his reservation. Thomas then told the officers that he could not remember the name on the ticket. Davis asked Thomas how he planned to leave the airport. Thomas replied that he had arranged for his sister to pick him up at 10:30 p.m., but that he had decided to take a cab because she was late and he did not want to wait. It was only 10:25 p.m. when Thomas made this statement. Thomas' hands trembled and he breathed heavily. When Davis mentioned that the officers were "drug agents," Thomas "seemed to kind of chill out" and he "calmed down" and readily consented to let the officers

-3-

search his bags for narcotics. The officers did not ask Thomas to sign a written consent form. Penny found the fraudulent credit cards and identification cards hidden under the innersole of a tennis shoe. The officers arrested Thomas. A later search of Thomas' wallet revealed, among other things, a computer printout with fraudulently obtained names, account numbers, and expiration dates for credit cards belonging to forty-four different people.

At the suppression hearing, Thomas did not testify or present any evidence. The district court found that the officers' initial curbside encounter with Thomas was "mere communication." Referring to Thomas' behavior and responses both before and after the officers asked him to return to the terminal, the district court ruled that Thomas' actions "constituted articulable facts that would reasonably warrant further inquiry." The district court noted that the request to return to the terminal building could arguably be construed to be a *Terry* stop (that is, a brief seizure supported by reasonable suspicion), but it did not specifically decide this question. Finally, the court ruled that the evidence showed that Thomas voluntarily consented to the search of his bag.

## II

Thomas claims that the district court erred when it denied his motion to suppress evidence seized from his bag at the airport and from his wallet. In reviewing an order denying a motion to suppress, we review the district court's conclusions of law *de novo*

and its factual findings for clear error. *United States v. Rivas*, 99 F.3d 170, 174 (5th Cir. 1996). The court views the evidence in the light most favorable to the prevailing party, here the government. *United States v. Ishmael*, 48 F.3d 850, 853 (5th Cir.), *cert. denied*, __ U.S. __, 116 S. Ct. 74, 133 L. Ed. 2d 34 (1995).

III

Thomas argues that the court should have suppressed the evidence taken from his bag and wallet because the officers "seized" him without reasonable suspicion when they asked him to reenter the terminal.

There are three kinds of police-citizen encounters: "[(1)] communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, [(2)] brief 'seizures' that must be supported by reasonable suspicion, and [(3)] full-scale arrests that must be supported by probable cause." *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982) (en banc). The first kind of encounter occurs, for instance, if law enforcement officers approach a traveler at an airport or bus station and ask to see his ticket and identification. *See United States v. Cooper*, 43 F.3d 140, 146 (5th Cir. 1995) (bus station); *United States v. Galberth*, 846 F.2d 983, 989 (5th Cir.) (airport), *cert. denied*, 488 U.S. 865, 109 S. Ct. 167, 102 L. Ed. 2d 137 (1988). A seizure occurs only if "in view of all the circumstances surrounding the incident, a reasonable

person would not have believed that he was free to leave." *Berry*, 670 F.2d at 595 (citation and internal quotation marks omitted); *see also Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2388, 115 L. Ed. 2d 389 (1983) (holding that police practice of approaching passengers on buses to ask questions and request consent to search could amount to seizure if a reasonable person would not have felt free to decline the officers' inquiries and terminate the encounter).

We find that the officers' request that Thomas reenter the terminal did not involve coercion or detention, and thus determine that it was not a "seizure." Nothing in the record indicates that Thomas, after being approached by the officers, believed he was not free to leave. The officers did not take Thomas' ticket, identification, or luggage; moreover, their encounter with him both inside and outside the terminal occurred in a public part of the airport and lasted for only a short time. *See Florida v. Royer*, 460 U.S. 491, 496, 103 S. Ct. 1319, 1323, 75 L. Ed. 2d 229 (1983) (suggesting that defendant at airport reasonably believed he was not free to leave because officers had taken defendant's ticket, identification, and luggage, and they had requested him to accompany them to small police interrogation room); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973) (referring to length of detention and repeated questioning as factors possibly suggesting coercion); *United States*

-6-

*v. Simmons*, 918 F.2d 476, 479-80 (5th Cir. 1990) (holding that a reasonable person in the defendant's situation would not have believed that his freedom was limited when agents approached him, identified themselves as law enforcement officers, and requested to speak to him). The officers did not suggest that failure to cooperate would lead to formal detention. *Berry*, 670 F.2d at 597. Nor did they display a gun, use threatening language or an intimidating tone of voice, touch Thomas, or otherwise attempt to restrain him. *United States v. Mendenhall*, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980). Lastly, the officers' request that Thomas step inside the terminal so they could speak to him there was perfectly understandable given the noise and congestion around the traffic median. It did not block him from proceeding or prevent his progress. *Berry*, 670 F.2d at 598.

In short, the officers' request contained no element of coercion or detention. *See Simmons*, 918 F.2d at 480 (noting that defendant's feeling that he was constrained to remain in officers' presence is irrelevant, as long as the record indicates no element of coercion or detention). Under the circumstances, then, Thomas should have reasonably believed that the request did not preclude him from leaving. Thus, the request was not a seizure. *Cf. United States v. Boone*, 67 F.3d 76, 79 (5th Cir. 1995) (holding that, where law enforcement officers ordered all passengers off bus

and then singled out defendant passenger in public area of terminal, officers' request to defendant to answer a few questions was not seizure), *cert. denied*, __ U.S. __, 116 S. Ct. 965, 133 L. Ed. 2d 886 (1996).

IV

Next, Thomas claims that he did not consent to the search of his bag and maintains that the district court erred in determining otherwise.

Whether Thomas agreed to permit the officers to search his bag is a factual issue. However, Thomas did not testify at the suppression hearing or present any evidence opposing the officers' testimony that he assented to the search. Moreover, there is nothing in the record that suggests that Thomas did not agree to the search. Thus, we determine that the district court did not clearly err in finding that Thomas consented to the officers' examination of his bag.

V

Lastly, Thomas argues that, even if he did consent to the search, the district court erred by finding that the consent was voluntary. Thomas claims that the allegedly illegal seizure tainted his consent, rendering it involuntary.

We focus on six factors in determining whether consent to a search was voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures;

-8-

(3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir.), *cert. denied*, 508 U.S. 944, 113 S. Ct. 2427, 124 L. Ed. 2d 647 (1993). None of the six factors is dispositive. *Id.* Specifically, proof that the defendant knew of his right to refuse consent))while relevant))is not required to show voluntariness. *Ponce*, 9 F.3d at 997.

As discussed above, Thomas was not in custody when he consented to the search, and there is no evidence that the police used coercive procedures. Thomas claims that he completed high school, and the record indicates that he has extensive prior experience with the criminal justice system. Moreover, because the officers told Thomas that they wanted to search his bag for narcotics, he may not have expected that they would discover the counterfeit credit cards or that they would immediately realize that the cards were contraband. *See United States v. Ho*, 94 F.3d 932, 937-38 & n.10 (5th Cir. 1996) (noting that the average narcotics officer might not recognize the "immediate criminal significance" of a counterfeit credit card). We determine that the district court did not clearly err in concluding that Thomas voluntarily agreed to allow the officers to search his bag.

AFFIRMED.